RECORD NO. 13-4476(L)
CONSOLIDATED W/ 13-4500, 13-4674

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JASMINE VERAS-ROSARIO;
VICTOR GARO-ZALAZAR;
ROY LEE CLAY,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE
The Honorable Catherine C. Blake, Presiding

## CONSOLIDATED OPENING BRIEF OF APPELLANTS

Michael D. Montemarano*
Michael D. Montemarano, PA
Suite 146
10630 Little Patuxent Parkway
Columbia, MD 21044
(410) 992-0067
montemarano67@gmail.com

*Lead Counsel & Counsel for
Appellant* Roy Lee Clay

Mark John Carroll
Attorney at Law
9520 Reach Road
Potomac, MD 20854
(301) 762-6453
markjcarroll@hotmail.com

*Counsel for Appellant
Jasmine Veras-Rosario*

Alan R.L. Bussard
Attorney at Law
Suite 200
101 East Chesapeake Avenue
Towson, MD 21286
(410) 821-5589
alan.bussard@bussardlaw.com

*Counsel for Appellant
Victor Garo-Zalazar*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# TABLE OF CONTENTS

Page

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Statement of Subject Matter and Appellate
   Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Statement of the Issues Presented for Review . . . . . . . . . . . . . . . . . . . . . . .  3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
          for Clay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
          for Veras-Rosario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
          for Garo Zalazar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Summary of the Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

**Notice of Controlling Circuit Authority** . . . . . . . . . . . . . . . . . . . . . . . . .  15

Arguments:

       I.  THE DISTRICT COURT ERRED IN PERMITTING A LAW
       ENFORCEMENT AGENT TO TESTIFY IN MIXED FORM AS
       BOTH A FACT AND EXPERT WITNESS, THEREBY SERVING
       AS A CONDUIT FOR TESTIMONIAL HEARSAY AND
       BLENDING ALLEGED "EXPERTISE" ABSENT FOUNDATION
       WITH FACTUAL TESTIMONY. THIS WITNESS WAS THE SAME
       AGENT TESTIFYING ABOUT THE SAME INVESTIGATION AS
       THAT IN THIS COURT'S RECENT PUBLISHED DECISION IN
       *UNITED STATES V. GARCIA*, NO. 13-4136, AND THE
       RESOLUTION OF THIS ISSUE  IS CONTROLLED BY THAT
       HOLDING.  *(all Appellants)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

i

II.  THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH EACH APPELLANT'S ENTRY INTO THE CONSPIRACY TO TRAFFICK 1 KG OF HEROIN.  THE FACTUAL BASIS FOR THE CONVICTIONS OF THE APPELLANTS RANGED FROM THE WEAK TO THE NON-EXISTENT.  *(all Appellants)* . . . . . . . . . . . . . . . . . 38

III.  THE DISTRICT COURT ERRED IN DENYING APPELLANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL AT THE CLOSE OF THE EVIDENCE, ON THE GROUNDS THAT THE EVIDENCE ADDUCED WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT EACH APPELLANT OF PARTICIPATION IN THE CONSPIRACY TO DISTRIBUTE OR POSSESS WITH THE INTENT TO DISTRIBUTE 1 KG OF HEROIN, GIVEN THE FACTS THAT EACH APPELLANT WAS NOT PART OF THE CONSPIRACY, DID NOT COMMIT ANY OVERT ACTS, AND WAS NEVER FOUND TO POSSESS ANY HEROIN OR MONEY OR OTHER INDICIA OF NARCOTICS TRAFFICKING.  *(all Appellants)* . . . . . . . . . . . . . . . . . . . . 47

IV.  THE DISTRICT COURT ERRED WHEN IT ALLOWED THE GOVERNMENT TO MAKE IMPROPER CLOSING AND REBUTTAL ARGUMENTS, WHICH SHIFTED THE BURDEN OF PROOF AND HIGHLIGHTED THE FAILURE OF APPELLANT VERAS-ROSARIO TO TESTIFY.     *(Appellant Veras-Rosario)* . . . . . . . 47

V.  THE DISTRICT COURT ERRED IN DENYING APPELLANT VERAS-ROSARIO'S REQUEST AT SENTENCING FOR THE SAFETY VALVE EXCEPTION PURSUANT TO 18 USC §§ 3553(A) &(F) AND USSG § 5C1.2, FOR WHICH SHE QUALIFIED. *(Appellant Veras-Rosario)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VI.  THE DISTRICT COURT ERRED IN DENYING APPELLANT VERAS-ROSARIO'S REQUEST AT SENTENCING FOR A DOWNWARD DEPARTURE FOR ACCEPTANCE OF RESPONSIBILITY PURSUANT TO USSG § 3E1.1(A). *(Appellant Veras-Rosario)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

VII.  THE DISTRICT COURT ERRED IN DENYING APPELLANT
VERAS-ROSARIO'S REQUEST AT SENTENCING FOR A
DOWNWARD DEPARTURE FOR HER MINOR ROLE, PURSUANT
TO USSG § 3B1.2(B).  *(Appellant Veras-Rosario)* . . . . . . . . . . . . . . . . . . .  62

Request for Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

# TABLE OF AUTHORITIES

## CASES

*Burks v. United States*,
  437 U.S. 1 (1978)..........................................................................39

*General Electric Co. v. Joiner*,
  522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ...............................36

*Glasser v. United States*,
  315 U.S. 60 (1942)........................................................................38

*Jackson v. Virginia*,
  443 U.S. 307 (1979)...................................................................39, 41

*Kotteakos v. United States*,
  328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946) ....................................37

*Ortega- Rodriguez v. United States*,
  507 U.S. 234 (1993)......................................................................39

*United States v. Aidoo*,
  670 F.3d 600 (4th Cir. 2012) ...........................................................56

*United States v. Banks*,
  10 F.3d 1044 (4th Cir. 1993) ...........................................................42

*United States v. Baptiste*,
  596 F.3d 224 (4th Cir. 2010) ...........................................................23

*United States v. Beltran-Ortiz*,
  91 F.3d 665 (4th Cir. 1996) ............................................................57

*United States v. Booker*,
  543 U.S. 220 (2005)......................................................................58

*United States v. Brack*,
  188 F.3d 748 (7th Cir. 1999) ...........................................................57

*United States v. Brownlee,*
　　204 F.3d 1302 (11th Cir. 2000) ....................................................56

*United States v. Burgos,*
　　94 F.3d 849 (4th Cir. 1996) ........................................................42

*United States v. Bubar,*
　　567 F.2d 192, (2d Cir.) *cert denied*, 434 U.S. 872 (1977) .............................51

*United States v. Bynum,*
　　604 F.3d 161 (4th Cir. 2010) ......................................................38

*United States v. Cruz,*
　　797 F.2d 90 (2nd Cir. 1986) ...................................................51, 52

*United States v. Curbelo,*
　　343 F.3d 273 (4th Cir.2003) ......................................................37

*United States v. Davis,*
　　557 F.2d 1239 (8th Cir.1977) ......................................................48

*United States v. Espinosa,*
　　172 F.3d 795 (11th Cir. 1999) ....................................................54

*United States v. Flanagan,*
　　80 F.3d 143 (5th Cir.1996) ........................................................53

*United States v. Gama-Basitida,*
　　142 F.3d 1233 (10th Cir. 1998) ..................................................56

*United States v. Gambino,*
　　106 F.3d 1105 (2d Cir.1997) ......................................................55

*United States v. Garcia,*
　　No. 13-4136, 2014 WL 1924857 (4th Cir. May 15, 2014)....................*passim*

*United States v. Giunta,*
　　925 F.2d 758 (4th Cir. 1991) ......................................................44

*United States v. Gonzalez,*
    897 F.2d 1018 (9th Cir.1990) ..........................................................................59

*United States v. Gotchis,*
    803 F.2d 74, 81 (2d Cir.1986) ........................................................................51

*United States v. Grabiec,*
    563 F.2d 313 (7th Cir.1977) ...........................................................................48

*United States v. Harvey,*
    532 F.3d 326 (4th Cir. 2008) ..........................................................................38

*United States v. Hill,*
    953 F.2d 452 (9th Cir.1991) ...........................................................................60

*United States v. Ivester,*
    75 F.3d 182 (4th Cir. 1996) ............................................................................57

*United States v. Johnson,*
    956 F.2d 894 (9th Cir.1992) .....................................................................59, 60

*United States v. Johnson,*
    587 F.3d 635 (4th Cir. 2009) ..........................................................................29

*United States v. Johnson,*
    617 F.3d 286 (4th Cir. 2010) ..........................................................................18

*United States v. Leonard,*
    157 F.3d 343 (5th Cir. 1998) ..........................................................................57

*United States v. Lowe,*
    65 F.3d 1137 (4th Cir. 1995) ..........................................................................39

*United States v. Maduka,*
    104 F.3d 891 (6th Cir.1997) ...........................................................................55

*United States v. Marones,*
    181 F.3d 888 (8th Cir. 1999) ..........................................................................55

*United States v. McKinney* ,
  15 F.3d 849 ( 9th Cir. 1994) ...................................................................58, 60

*United States v. McLean*,
  715 F.3d 129 (4th Cir. 2013) ...........................................................................18

*United States v. Modica*,
  663 F.2d 1173 (2d Cir.1981), *cert. denied,* 456 U.S. 989 (1982) ..................52

*United States v. Nersesian*,
  824 F.2d 1294 (2d Cir.), *cert. denied,* 484 U.S. 958 (1987) ..........................52

*United States v. Ollivierre*,
  378 F.3d 412 (4th Cir. 2004) ...........................................................................48

*United States v. Ortiz-Santiago*,
  211 F.3d 146 (1st Cir. 2000)............................................................................57

*United States v. Powell*,
  680 F.3d 350 (4th Cir. 2012) ...........................................................................62

*United States v. Powell*,
  982 F.2d 1422 (10th Cir. 1992) .......................................................................45

*United States v. Pratt*,
  239 F.3d 640 (4th Cir.2001) ............................................................................62

*United States v. Ramirez*,
  94 F.3d 1095 (7th Cir.1996) ............................................................................53

*United States v. Rodriguez*,
  975 F.2d 999 (3rd Cir.1992) ............................................................................60

*United States v. Romer*,
  148 F.3d 359 (4th Cir. 1998) ...........................................................................38

*United States v. Schreiber*,
  191 F.2d 103 (2nd Cir. 1999) .....................................................................54, 56

*United States v. Shrestha*,
    86 F.3d 935 (9th Cir. 1996) ...........................................................................56

*United States v. Staten*,
    666 F.3d 1564 (4th Cir.   2011), *cert. denied,* 132 S.Ct. 1937 (2012) ............16

*United States v. Thompson*,
    76 F.3d 166 (7th Cir. 1996) ...............................................................56, 57, 61

*United States v. Thompson*,
    81 F.3d 877 (9th Cir.1996) ...............................................................................55

*United States v. Tournier*,
    171 F.3d 645 (8th Cir. 1999) ...........................................................................56

*United States v. Tresvant*,
    677 F.2d 1018 (4th Cir. 1982) ....................................................................38, 39

*United States v. Walker*,
    835 F.2d 988 (2nd Cir. 1987) .....................................................................51, 52

*United States v. White*,
    119 F.3d 70 (1st Cir.1997).................................................................................55

*United States v. Wilson,*
    484 F.3d 278 (4th Cir. 2007) ......................................................................18, 23

*United States v. Wivell*,
    893 F.2d 156 (8th Cir.1990) .......................................................................59, 60

*United States v. Young*,
    609 F.3d 348 (4th Cir. 2010) ...........................................................................38

## STATUTES

18 U.S.C. § 3231...................................................................................................2
18 U.S.C. § 3553(a) .........................................................................................4, 14
18 U.S.C. § 3553(f).........................................................................................4, 53
18 U.S.C. § 3553(f)(5).........................................................................................54
21 U.S.C. § 841(a)(1)...........................................................................................41

21 U.S.C. § 846................................................................5, 40, 41

21 U.S.C. § 848....................................................................54

28 U.S.C. § 1291....................................................................2


U.S.S.G. § 3B1.2..................................................................62

U.S.S.G. § 3B1.2(b)............................................................4, 14

U.S.S.G. § 5C1.2..........................................................4, 14, 53

U.S.S.G. § 3E1.1..............................................................58, 59

U.S.S.G. § 3E1.1(a)......................................................4, 14, 58

U.S.S.G. § 3E1.1(b)............................................................58

U.S.S.G. § 4A1.3..................................................................54

## TREATISES

Sentencing Guidelines in 1994, Mandatory Minimum Sentencing Reform Act of
    1994,Pub. L. No.103-322, tit. VIII, 108 Stat. 1796 (codified at 18
    U.S.C. § 3553(f)................................................................53


H.R. REP. No. 103-460 (1994)................................................53

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

————

No. 13-4674

————

**ROY LEE CLAY,** *et al.*

Appellants,

v.

**THE UNITED STATES OF AMERICA**,

Appellee.

————

JOINT BRIEF OF APPELLANTS

————

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND,
NORTHERN DIVISION
(Catherine C. Blake, USDJ)

————

Michael D. Montemarano
Michael D. Montemarano, P.A.
10630 Little Patuxent Parkway
Suite 146
Columbia, MD 21044
(410) 992-0067/Fax 992-6915
montemarano67@gmail.com
For Appellant Clay

Mark John Carroll
Attorney at Law
9520 Reach Road
Potomac, MD 20854
(301) 762-6453
markjcarroll@hotmail.com
For Appellant Veras-Rosario

Alan R.L. Bussard
Attorney at Law
Suite 200
101 East Chesapeake Avenue
Towson, MD 21286
(410) 821-5589
alan.bussard@bussardlaw.com
For Appellant Garo-Zalazar

## STATEMENT OF SUBJECT MATTER
## <u>AND APPELLATE JURISDICTION</u>

This is an appeal from final judgment in a criminal case entered against Appellants.   Jurisdiction in the District Court was based upon 18 USC § 3231.

By Notices of Appeal filed in the district court, Appellants request this Court to review the final decision of the district court as to their convictions and sentences, pursuant to the jurisdiction conferred by 28 USC § 1291.

## STATEMENT OF
## THE ISSUES PRESENTED FOR REVIEW

*Issue I        (all Appellants)*

Whether the district court erred in permitting a law enforcement agent to testify in mixed form as both a fact and expert witness, thereby serving as a conduit for testimonial hearsay and blending alleged "expertise" absent foundation with factual testimony?

*Issue II       (all Appellants)*

Whether there was sufficient evidence to sustain the conviction of each Appellant on conspiracy to distribute more than 1 kg of heroin?

*Issue III      (all Appellants)*

Whether the district court erred in denying Appellants' motions for judgment of acquittal at the close of the evidence, on the grounds that the evidence adduced was insufficient as a matter of law to convict each Appellant of participation in the conspiracy to distribute or possess with the intent to distribute heroin, given the facts that each Appellant was not part of the conspiracy, did not commit any overt acts, and was never found to possess any heroin or money or other indicia of narcotics trafficking?

*Issue IV     (Appellant Veras-Rosario)*

Whether the trial court erred when it allowed the government to make improper closing and rebuttal arguments?

*Issue V     (Appellant Veras-Rosario)*

Whether the district court erred in denying Appellant Veras-Rosario's request at sentencing for the safety valve exception pursuant to 18 USC §§ 3553(a) &(f) and USSG § 5C1.2, for which she qualified?

*Issue VI     (Appellant Veras-Rosario)*

Whether the district court erred in denying Appellant Veras-Rosario's request at sentencing for a downward departure for acceptance of responsibility pursuant to USSG § 3E1.1(a)?

*Issue VII     (Appellant Veras-Rosario)*

Whether the district court erred in denying Appellant Veras-Rosario's request at sentencing for a downward departure for her minor role, pursuant to USSG § 3B1.2(b)?

## STATEMENT OF THE CASE

Appellants were charged in a single count of a second superseding Indictment ("the Indictment"), JA 79, ECF 484, filed in the District of Maryland on January 24, 2013, with conspiracy to distribute more than 1 kg of heroin (21 USC § 846), arising out of events in the period from 2009 through 2011.

Motions were heard on September 5, 2012, in the United States District Court for the District of Maryland, Northern Division, at Baltimore, before the Honorable Catherine C. Blake, USDJ. Trial was held before a jury from February 25 to March 21, 2013, for a total of 14 trial days. JA 16-18, ECF 535-553. On March 21, jury returned a verdict of guilty as to each defendant. JA 17-18, ECF 559.

At sentencing on August 27, 2013, Appellant Clay received a sentence of life imprisonment. JA 18, ECF 632, 639. At sentencing on June 7, 2013, Appellant Veras-Rosario received a sentence of ten years imprisonment. JA 36, ECF 610, 611. At sentencing on June 21, 2013, Appellant Garo-Zalazar received a sentence of five years imprisonment. JA 56, ECF 610, 611. Each Appellant noted a timely appeal. JA 18, ECF 589 (Clay); JA 36, ECF 589 (Veras-Rosario); JA 56, ECF 635 (Garo-Zalazar).

## **STATEMENT OF FACTS**

The various iterations of the indictment alleged a multi-year, multi-state conspiracy to traffick heroin.  The heroin had its origin in New York, and was brought to Maryland by Garcia or his designees.  It was delivered to Powell, and was claimed to be delivered to Appellant Clay as well.  The government claimed that Appellants Garo-Zalazar and Veras-Rosario, along with Veras-Rosario's husband, were involved in couriering drugs from New York to Baltimore.  No drugs were ever observed being delivered to Appellant Clay, nor was anything seized from his person or his home – no paraphernalia, packaging, or drugs of any sort.

All three Appellants were charged in each iteration of the indictment.  The lead defendant originally was one Danilo Garcia, JA 61, who was convicted in October, 2012, after a twelve day trial.  Appellant Clay also went to trial with Garcia; the jury hung, and he received a mistrial.  JA 75, ECF 418.  Garcia then noted an appeal to this Court.

All three Appellants went to trial in February, 2013, and were convicted after a trial lasting fourteen days.  JA 16-18, ECF 535-553.  They noted appeals.

During the pendency of the instant appeals, this Court reversed Garcia's conviction.  *United States v. Danilo Garcia,* — F.3d —, 2014 WL 1924857 (4th Cir. No. 13-4136; May 15, 2014).  As will be described throughout this Joint Brief, the cases presented by the government against the two sets of defendants were nearly

identical, most particularly their evidentiary bases in their reliance upon a law enforcement witness who served both as a fact and an expert witness, and did so improperly. It was this facet of Garcia's trial which resulted in the reversal of his conviction. As this Court noted, the case against Garcia (who was also charged in four substantive narcotics offenses, was "not ironclad." *Id.* at *12.

## Clay

Appellant Clay was determined to have spoken on the phone, and on occasion met with, many, but not all, of those charged with him, as well as many other persons. There were no seizures of money or drugs from Appellant Clay, nor was he ever surveilled involved in narcotics transactions or deliveries. The virtual entirety of the case against Appellant Clay was founded on ultimately specious testimony by FBI SA Dayton, who testified in this matter concerning the deciphering of allegedly "coded" language on the eight wiretapped phone lines, involving Clay and others,[1] and allegedly tied to heroin distribution. SA Dayton's testimony regarding this case, this wiretap and this investigation was the first time she had been qualified as an expert. *Garcia*, 2014 WL 1924857 at *3.[2]

---

[1]  Two of the eight phone lines were attributed to Clay, and four to Garcia.

[2]  It is interesting to note that when counsel inquired during the second trial, SA Dayton claimed to have been previously qualified as an expert, JA 244, which statement is in contradiction to her testimony at the first trial. Plainly, she had not qualified prior to testifying *in this case about this investigation*, and her (and government counsel's) failure to make this clear to the jury in the second trial

To be sure, SA Dayton's testimony was supplemented at both trials by a cooperator, Rodriguez, who made certain unsubstantiated claims against Garcia and Appellant Clay. In the second trial, another cooperator, Ekun, was added to the mix. Ultimately, however, this Court held in Garcia that his "involvement in the conspiracy, rests on the connection between various individuals that was only established through the hundreds of calls played at trial. And while the contents and context of many of these calls indisputably point to illegal activity, we are unable to hold that the jury was unaffected by Agent Dayton's unadorned interpretations." *Id.* at *12. SA Dayton was the linchpin in each trial.

## Veras-Rosario

The government alleged that Appellant Veras-Rosario was involved in the drug conspiracy. JA 79, 123. The government built a case against Appellant Veras-Rosario utilizing a Title III wiretap against the co-defendants in this case. JA 268. There were over 21,000 calls recorded over a series of telephones JA 270-271. Of these calls, 1900 were deemed pertinent JA 665. There was no wiretap on the telephone of Appellant Veras-Rosario or that of her husband and co-defendant, Jan Carlos Veras-Rosario. JA 459. The government played during the course of the trial but ten telephone calls in which Apellant Veras-Rosario was a participant. JA 644, 695,

---

appears too clever by half.

8

702, 752, 1155, 1221-1223, 1360, 1371.

On February 27, 2011, a member of the Baltimore City Police Department seized $7,000 in currency from Appellant Veras-Rosario's husband, Jan Carlos Veras-Rosario. At the time, he was with Appellant Garo-Zalazar in Baltimore. JA 518, 521. The police officer believed the money to be proceeds of drug transactions. JA 522. At that point, law enforcement was entirely unaware of any conversations that had taken place between Appellant Veras-Rosario and her husband. JA 1270. These calls made clear that Appellant Veras-Rosario believed that the money taken from her husband had been from his income tax refund, JA 1273, and she wanted to hire a lawyer or call the police to get her husband's money back, JA 1272-1273.

On April 3, 2011, Appellant Veras-Rosario was observed on a single instance in Baltimore, Maryland. She was photographed walking with her husband into co-defendant Powell's house. JA 804-806. No drugs or money were ever recovered from her. JA 1417.

**Garo-Zalazar**

As to Appellant Garo-Zalazar, the Government's evidence established that he was a citizen of the Dominican Republic with a valid passport. At all times relevant to the case, he was a resident of New York City where he resided with his mother. He traveled to the Dominican Republic on June 15, 2011, returning in November, 2011. JA 1292-1293.

Starting in or about February, 2012, it was alleged that Appellant Garo-Zalazar was intercepted during telephone communications between codefendants Powell and Jan Carlos Veras-Rosario. During all calls pertinent to this case, Appellant Garo-Zalazar acted as an Spanish language interpreter for Jan Carlos Veras-Rosario. Prior to the initiation of the Title III intercept, Appellant Garo-Zalazar was not a target of the investigation. All intercepts of Appellant Garo-Zalazar were on telephones linked to others in the charged conspiracy, not on his phone.

On February 27, 2011, as a result of the ongoing investigation, law enforcement stopped Jan Carlos Veras-Rosario along with Appellant Garo-Zalazar at the Baltimore Travel Plaza, as they were preparing to travel to New York City from Baltimore, Maryland. A search of Jan Carlos Veras-Rosario revealed approximately $7,000 in currency in his coat pocket. Nothing was seized from Appellant Garo-Zalazar, who acted as an interpreter in conversations between Veras-Rosario and law enforcement, and was not arrested. Several days later Appellant Garo-Zalazar accompanied Jan Carlos Veras-Rosario as he unsuccessfully attempted to recover the seized funds from the Baltimore Police Department. On this occasion, Appellant Garo-Zalazar again acted in the capacity of an interpreter.

At trial, the government presented evidence consisting primarily of eleven (11) telephone calls involving Appellant Garo-Zalazar. SA Dayton, in testifying for the government in her capacity as either a fact or expert witness, and often both,

identified Appellant Garo-Zalazar as being one of the participants on the calls, an identification made solely through voice recognition. No evidence or other testimony was presented where Appellant Garo-Zalazar was actually observed to be talking on a telephone at the time of the recorded calls. Furthermore, aside from SA Dayton's claim, untethered to any factual basis, the government presented no other evidence which identified Appellant Garo-Zalazar's voice on the call. The government's evidence also included two calls on June 21, 2011, call numbers 4517 and 4518, respectively, JA 2278-2286, wherein SA Dayton specifically identified Appellant Garo-Zalazar as a participant on the calls, based upon her expert opinion, voice recognition, and content of the calls. She unequivocally opined that the calls were not three-way calls, meaning that Appellant Garo-Zalazar was at the same location as Jan Carlos Veras-Rosario, in New York City at the time of the calls.

SA Dayton was later confronted by evidence presented by the defense which established incontrovertibly that Appellant Garo-Zalazar was in the Dominican Republic at the time of these particular referenced calls and could not have participated in the calls, SA Dayton retracted her testimony and admitted that she was mistaken about these calls. JA 1297-1298.

Throughout the trial, the government characterized Appellant Garo-Zalazar's role in the alleged conspiracy as that of a "courier" and Spanish language interpreter for Jan Carlos Veras-Rosario. No evidence was produced wherein Appellant

11

Garo-Zalazar was in possession of either CDS or currency, or that he knowingly participated in any narcotics activity.

During the course of the trial, the Government presented two cooperating witnesses, Rodriquez and Tasleen Ekun, both of whom were integral members of the conspiracy. Neither identified Appellant Garo-Zalazar as being part of the charged conspiracy.

The only other evidence purporting to establish a conspiracy and Appellant Garo-Zalazar's membership in the conspiracy consisted of extrajudicial statements made by Appellant Garo-Zalazar following his arrest in New York, wherein it was alleged that he admitted that he knew other alleged members and was familiar with coded language used by others when referring to controlled substances. There was no recording of the post-arrest statement and no written documents in which Appellant Garo-Zalazar adopted the alleged statements to law enforcement.

Additional facts will be adduced as necessary in the several Arguments, *infra.*

## SUMMARY OF THE ARGUMENTS

*Issue I*                    *(all Appellants)*

The district court erred in permitting a law enforcement agent to testify in mixed form as both a fact and expert witness, thereby serving as a conduit for testimonial hearsay and blending alleged "expertise" absent foundation with factual testimony, and failing to act as a "gatekeeper" against this kind of impermissible melding. This witness was the same officer testifying about the same investigation and same evidence, and providing the same alleged "expertise," as in this Court's recent published decision in *United States v. Garcia*, and this issue is controlled by that holding.

*Issue II*                   *(all Appellants)*

There was insufficient evidence to establish each Appellant's entry into the conspiracy to traffick 1 kg of heroin.  The factual basis for the convictions of the Appellants ranged from the weak to the non-existent.

*Issue III*                  *(all Appellants)*

The district court erred in denying Appellants' motions for judgment of acquittal at the close of the evidence, on the grounds that the evidence adduced was insufficient as a matter of law to convict each Appellant of participation in the conspiracy to distribute or possess with the intent to distribute 1 kg of heroin, given the facts that each

13

Appellant was not part of the conspiracy, did not commit any overt acts, and was never found to possess any heroin or money or other indicia of narcotics trafficking.

*Issue IV*         *(Appellant Veras-Rosario)*

The trial court erred when it allowed the government to make improper closing and rebuttal arguments, which shifted the burden of proof and highlighted the failure of Appellant Veras-Rosario to testify.

*Issue V*         *(Appellant Veras-Rosario)*

The district court erred in denying Appellant Veras-Rosario's request at sentencing for the safety valve exception pursuant to 18 USC §§ 3553(a) & (f) and USSG § 5C1.2, for which she qualified.

*Issue VI*         *(Appellant Veras-Rosario)*

The district court erred in denying Appellant Veras-Rosario's request at sentencing for a downward departure for acceptance of responsibility pursuant to USSG § 3E1.1(a).

*Issue VII*         *(Appellant Veras-Rosario)*

The district court erred in denying Appellant Veras-Rosario's request at sentencing for a downward departure for her minor role, pursuant to USSG § 3B1.2(b).

14

## NOTICE OF CONTROLLING CIRCUIT AUTHORITY

As previously described, *supra,* on May 15, 2014, a unanimous panel of this Court issued a published opinion in *United States v. Danilo Garcia,* — F.3d —, 2014 WL 1924857 (4th Cir. No. 13-4136), reversing the conviction of the single appellant, Danilo Garcia.  Appellant Garcia had been charged as a coconspirator (and lead defendant) of the instant Appellants.  JA 61, ECF 314.   Appellant Clay went to trial with Garcia in October, 2012, JA 11, ECF 380, as a result of which Garcia was convicted, while Clay received a mistrial.  JA 75, ECF 418.  Clay then went to trial again, this time with the other Appellants in February, 2013.  JA 16, ECF 535.

The October 2012 Garcia trial was prosecuted by the same AUSAs who handled the second trial, in February, 2013, which gives rise to the instant appeal.  The government, not wishing to diverge from the success it had achieved in convicting Garcia, the lead defendant, relied in the second trial on substantially the same evidence as it had put forward in the October trial, and it was this evidence which provided the basis for the reversal of Garcia's conviction.

The fulcrum of the government's case, and the basis for the reversal by this Court, was the testimony of an FBI SA, Dayton, who inextricably mingled "her lay fact testimony, based upon her personal knowledge, on the one hand, and her expert opinion testimony based upon he training and investigatory experience, on the other." Her expertise purported to explain coded language in the monitored phone calls.  The

15

problem in this, which arose before she even took the stand in either trial, was distinguishing the basis for her expert testimony, and ensuring that it was based upon "her experience and expertise in coded language, and not simply repeating what cooperators and witnesses told her." *Garcia,* 2014 WL 1924857 at *4.

This necessary bifurcation and discrimination between the types of Dayton's testimony did not take place, and her testimony was entirely intermixed, meaning that it was entirely infected with this very error, error which the district court was unable to ameliorate, as this Court found. This Court reversed Garcia's conviction on this basis. *Id.* at *1.

Appellants respectfully submit that a reversal is mandated on the same basis, and for the same evidentiary error which infected their trial no less than it did Garcia's.

On June 27, the government informed this Court via letter that it would not seek rehearing or rehearing en banc on the Garcia decision. No. 13-4136, ECF 66. Accordingly, the published decision in *Garcia* is the law of the Circuit, as another panel cannot overrule the *Garcia* panel's decision to reverse and remand on this evidence. *United States v. Staten,* 666 F.3d 1564, 160 (4th Cir. 2011), *cert. denied,* 132 S.Ct. 1937 (2012).

While the instant Appellants could have deconstructed and reiterated the masterful arguments set forth by counsel for Garcia in the brief in that appeal, No. 13-

4136, ECF 35, and then linking them to the facts in the second trial, such ultimately is not necessary. Rather, what Appellants have chosen to do, as set forth in Issue I, *infra*, is to analyze, albeit briefly, this Court's opinion in *Garcia*, and to juxtapose the repeated errors in that trial to those in the second trial, to demonstrate both the nature and extent of the parallel – and often identical – errors, errors which underlay that reversal and which now compel the reversal of Appellants' cause.

<u>**ARGUMENT**</u>

**I.   THE DISTRICT COURT ERRED IN PERMITTING A LAW ENFORCEMENT AGENT TO TESTIFY IN MIXED FORM AS BOTH A FACT AND EXPERT WITNESS, THEREBY SERVING AS A CONDUIT FOR TESTIMONIAL HEARSAY, AND BLENDING ALLEGED "EXPERTISE" ABSENT FOUNDATION WITH FACTUAL TESTIMONY. THIS WITNESS WAS THE SAME AGENT TESTIFYING ABOUT THE SAME INVESTIGATION AS THAT IN THIS COURT'S RECENT PUBLISHED DECISION IN *UNITED STATES V. GARCIA*, NO. 13-4136, AND THE RESOLUTION OF THIS ISSUE IS CONTROLLED BY THAT HOLDING.**

<u>**Standard of Review**</u>

All Appellants join this issue.

This Court noted in *Garcia, supra,* that it will "review a district court's decision to qualify an expert witness, as well as the admission of such testimony, for abuse of discretion. *United States v. Wilson,* 484 F.3d 267, 273 (4th Cir .2007). 'A court abuses its discretion if its decision is 'guided by erroneous legal principles' or 'rests upon a clearly erroneous factual finding.'' *United States v. McLean,* 715 F.3d 129, 142 (4th Cir.2013) (quoting *United States v. Johnson,* 617 F.3d 286, 292 (4th Cir.2010))." *United States v. Garcia,* 2014 WL 1924857 at *5.

**Argument** – *all Appellants*

> *"It's* deja vu *all over again."*

Lawrence Peter "Yogi" Berra

This Court's decision in *Garcia*, *id.,* certainly engenders a sense of *deja vu* when considering the course of the trial of these Appellants, the second trial on the same indictment (hereinafter, "the second trial"). The earlier trial of Garcia was held before the same judge and prosecuted by the same AUSAs. JA 1-2. The testimony in the Garcia trial ("the first trial") covered about 90 percent of the second trial, with the latter featuring only three witnesses who had not testified in the first trial. Nearly the same assortment of calls were played for the jury. The centerpiece of the government's "not ironclad" case, *Garcia*, 2014 WL 1924857 at *12, involving defendants neither seized with drugs nor charged with substantive offenses,[3] was FBI SA Carrie Dayton.

SA Dayton testified in two roles, both as a fact witness, having been involved in the investigation from the outset, and having monitored phone lines and debriefed witnesses and cooperators, and also as an expert witness, to "interpret" the meaning of "coded" language used by the participants on the monitored calls played for the jury. Some of these calls involved only Spanish speakers and were translated, with the translations being read in lieu of the playing of the actual call.

---

[3] Garcia was charged in four separate substantive offenses, and the conspiracy involving the Appellants. *Cf. Garcia,* at *12.

In each trial this dual role played by SA Dayton was recognized as creating a problem, both by the district court and by defense counsel. The court, recognizing its obligations, in each trial admonished the government to ensure that the shifting basis for SA Dayton's testimony was clear. *Garcia,* at *4; JA 261-263, 300-303. With that, however, the court apparently considered its job done, as it failed to continue to monitor the testimony of SA Dayton, which never was to be adequately differentiated between these roles. This Court recognized in *Garcia* that these shifting roles required "special care" to ensure that the "true bases" for SA Dayton's testimony was amply clear to the jury. *Garcia,* at *4. In fact, in the second trial, the district court failed to issue the cautionary instruction which it gave in the first trial, and which this Court approved in *Garcia, id.* JA 266-267, 300-303.

In failing to maintain and fulfill its recognized role as "'gatekeeper,'" *Garcia,* at *11, to ensure that if SA Dayton were to testify in dual roles that the jury be completely apprised of the bases for her varying types of testimony (so as to be able both to differentiate the varied sources of the testimony, and to distinguish when these switched), the district court failed in its duty to ensure that the jury would be adequately able to accord them independent consideration. This was not done in Garcia's trial, as this Court observed from the outset. Error was manifest, in the interrelated and undifferentiated

conflation of Agent Dayton's expert and fact testimony, particularly her

20

reliance on her knowledge of the investigation to support her coding interpretations; her failure to apply her methodology reliably; and last, her failure to state on the record an adequate foundation for very many of her specific interpretations. Moreover, because Agent Dayton's testimony was so extensive and most likely highly influential in the jury's evaluation of the Government's case against Garcia, we are constrained to hold that these flaws deprived Garcia of a fair trial, i.e., that the missteps were not harmless, and thus require vacatur of Garcia's convictions.

*Garcia,* at *7.

So too in the second trial which leads to this appeal, as SA Dayton referenced the sourcing for her confirmation of her "expertise" within the context of the investigation – *first doing so during her voir dire on her qualifications, and within the first ten pages of transcript on this subject.*

> SA Dayton: Again, it may come from talking to either witnesses or cooperators who tell us that when you hear this term, we are referring to that. Sometimes we see some common terms. Like the word receipt is not uncommon, an uncommon code word for money. Then, again, in the context of the call, and then when we do surveillance, or if there is an arrest done in connection with phone calls or surveillance, we may actually seize drugs.

JA 224. Plainly, SA Dayton was unable to distinguish the difference, and this offers the most glaringly obvious insight into her lack of comprehension of what constitutes expertise and the appropriate boundaries to be self-imposed by an ostensible expert. Without the cautionary instruction having being given in the second trial, the error becomes yet more palpable.

SA Dayton:  Sure.  If somebody says apple, they may actually be talking

about an apple, and they may not, and we figure that out through our investigation.

Mr. Smith:[4] Through your investigation. *Anything else?*

JA 239 (emphasis supplied).

It may well be that law enforcement does "figure" things "out" in the course of its investigation, but when it does so, however, then the testimony in this regard is all-too obviously not expert testimony, rather it is factual testimony to be related to the jury through percipient witnesses. More to the point, however, is the abject failure of government counsel to attempt in any real fashion to follow the district court's admonition to ensure such differentiation was provided, and the concomitant failure of the court to follow through on this admonition or to instruct the jury as it had in the first trial.

It is plain that defense counsel in the second trial immediately recognized this problem, in no small part perhaps stemming from their familiarity with what had transpired in the Garcia trial. Their voir dire challenged SA Dayton, and they raised objections to the court.    JA 227-267. Defense counsel did all they could, but with their objections to SA Dayton having been dismissed by the court with little discussion and less explanation, they were without ability to ameliorate this. In that SA Dayton

---

[4] Counsel to Appellant Clay in the second trial. See JA 1.

never had qualified previously as an expert, however, and that government counsel was similarly unable to discriminate between these aspects of SA Dayton's testimony, the role of the court in policing this went beyond merely vital or important, rather it was absolutely crucial to ensure that the jury understood this differentiation, so as to ensure a fair trial was accorded these Appellants.  In this the district court failed in the second trial no less than it did in the first.

> Garcia contends that there were inadequate safeguards to protect the jury from conflating Dayton's testimony as an expert and fact witness.  We agree.  We have recognized that individuals who testify as expert and fact witnesses can cause jury confusion, and such a manner of proceeding is only "acceptable where 'the district court took adequate steps ... to make certain that [the witness's] dual role did not prejudice or confuse the jury.' " *[United States v.] Baptiste,* 596 F.3d [ 214,] at 224 [4th Cir. 2010] (quoting *[United States v.] Wilson,* 484 F.3d [267,] at 278 n. 5 [4th Cir. 2007]) (alternations in original).

Garcia, at *7 .

The obvious means by which to accomplish this would have been for the court, yet again having approved of SA Dayton as an expert over the exhaustive objections of defense counsel in a second trial, then to interject and rein in government counsel when the questioning failed to remain within the appropriate boundaries, as it so clearly did again in the second trial.  By contrast, however, the court's sanction of this testimony in the second trial did not even go so far as to track the path the government had blazed in the first trial, and which was to lead to Garcia's reversal and

remand for its inadequacy.

> The district court represented to the jury that Government counsel would "be clear in their questions" whether they were asking Agent Dayton to testify based on the facts versus her expertise. J.A. 327. Despite this direction, the Government failed to do so: *there were repeated instances of Agent Dayton moving back and forth between expert and fact testimony, with no distinction in the Government's questioning or in Agent Dayton's answers.* And this was true despite the fact that the Government recalled Agent Dayton to the stand eighteen times. In light of the court's earlier assertion that counsel would clearly distinguish the two types of testimony, the jury reasonably might have assumed that all of Agent Dayton's testimony in response to questions asking for her expert opinion was indeed based on her decoding expertise.

*Garcia,* at *8 (emphasis supplied).   There was no groundwork laid for such an *assumption* on the part of the jury during the second trial, for the jury was not instructed as it had been in the first trial; it only heard that SA Dayton had been accepted as an expert, and nothing else, meaning that it could only understand all of SA Dayton's testimony to rest upon her alleged "expertise."  The court exacerbated the confusion of its own manufacture by again neglecting the required policing of SA Dayton's testimony, answer by answer, thereby worsening the already bad situation beyond the bounds which had required the reversal in *Garcia.*

　　　　Of course, this representation regarding the clarification of the sources of SA Dayton's testimony was not met, and was barely attempted, during the second trial, and certainly no more than in the first.  In nearly every instance where detail or background was sought regarding SA Dayton's conclusions, government counsel failed

24

to ensure that her answers were based upon the correct source – her alleged expertise. Rather, the open-ended questions by government counsel routinely permitted SA Dayton to revert to her paramount source of information, the hearsay which she gained during the investigation and then communicated to the jury, which government counsel often would reinforce in the same manner.

> Ms. Ducao:   Did you hear any conversations as it related to young ladies who were coming down from New York to engage in romantic liaisons with individuals in Baltimore?
>
> SA Dayton:   Actually, the calls I heard about young ladies coming down from New York were ladies who were bringing, were mules or being couriers of heroin to Baltimore.
>
> Ms. Ducao:   So you heard nothing about any kind of relationships that may have existed in terms of those ladies with hotels or liaisons or that kind of business, right?
>
> SA Dayton:   I did not hear any talk of hotels and the ladies coming down from New York, other than that the Best Western Hotel is located in the Travel Plaza, where the van that comes from New York stops.

JA 308.  Again, there was no means by which SA Dayton's "expertise" discerned these women as mules, a status which only was revealed by the investigation.

> SA Dayton:   We then right in the middle of the page see Mr. Garcia say the police take the number five. Number five is code for 500 grams of heroin, and we've seen Mr. Garcia use that code before, number three, number four, but in this case it was number five, which we were able to validate. *When we seized the 500 grams of heroin from*

*Ms. Feliciano, that's how we validated this particular code.*

JA 1396 (emphasis supplied).

This repetitive error is one which this Court is familiar with, as it held in

*Garcia.*

> Instead, this exemplifies occasions, and we discern many of them, in which Agent Dayton simply substituted information gleaned from her participation in the investigation (including post-indictment debriefings of participants in the conspiracy) for ostensible expertise. For this, the Government need not have called a "decoding" expert at all: simply pointing to the seizure of 145 grams of heroin, and then the repeated mention of "145" in this call clearly would have been enough for any juror to make the connection. But cloaking this connection in the guise of expert testimony goes beyond what is contemplated under Federal Rule of Evidence 702, which requires an expert to "reliably appl[y] the principles and methods" for which she was qualified as an expert.

*Garcia,* at *8

SA Dayton did this repeatedly, and in both trials, since the investigation served as the primary source of her information, a hardly surprising observation in light of her *de minimis* level of expertise. Indeed, this underlay most of her testimony, as she repeatedly pointed out in clarification of her testimony.

> "It's talking with cooperators who talked about the language which was used." JA 371.

> "That is just terminology we saw throughout the telephone calls, and then we would have the follow-up surveillance to see their interaction. Also we were told by cooperators that the term car and the term transmission were used as code for heroin." JA 406.

26

> "Again, these are terms we kind of saw throughout these calls. Then our follow-up surveillance, and debriefing of cooperators, we were able to confirm some of these terms." JA 409-411.

This pattern continued throughout the trial, unabated.

> "As I testified, that's code, $6,000, because he's collecting money from these folks." JA 457.

> "Based on our investigation and the calls before and after, I interpreted thing as money, cash." JA 475.

> "It's just the language we saw him use throughout this case, where he would talk about the girl.  Sometimes it would be referring to the mule, and sometimes it would be referring to the heroin itself.  It's kind of just the context of the calls over time and then reading the calls altogether."        JA 551.

> "Make it a party is consistent with the language we saw in the prior call or two and Mr. Garcia discussing that he was going to send someone to Baltimore, or send someone down."  JA 556.

This last bit of testimony evoked a clear and succinct objection by counsel for Appellant Veras-Rosario,[5] framing the issue as clearly as the district court could have hoped.

Mr. Carroll: Your Honor, this witness is giving conclusions in this case. She keeps changing whether it's expertise or she's a fact witness. She is saying the girl is the courier. Well, I don't read it that way. She's saying she knows it from the prior calls in this case. So she's not basing it on expertise. She is basing it on her personal experience in this case. It appears from the last three calls she is talking about my client. She refers to my client as Yahida, and she's saying from

---

[5]  Mark J. Carroll, Esq., counsel for Appellant Veras-Rosario, and a former FBI agent..

27

these other calls I know that it's her. Well, she's basing that on assumption, on guesses, and not on expertise. It started with call number 605, and she has been referring to the courier. In the past she's always saying girl means heroin, it's a euphemism for heroin. Well, now she's switching it and saying girl means a courier. She is saying based on my experience, in listening to these other calls, they are now talking about a courier. I don't see it. I see her as a fact witness, opining on what she thinks is happening in this case and not on the evidence. So she's giving an expert opinion with conclusions.

The Court:  Okay.

Mr. Carroll: I would ask you to strike it.

JA 556-557.

Even as the district court again failed to assimilate the pervasive nature of this problem in the second trial, this Court was recognizing the extent of the problem in the first trial.

In light of this significant ingredient in Agent Dayton's expertise, it was incumbent upon the Government to demonstrate that Agent Dayton was not merely channeling information and statements by non-testifying participants in the conspiracy into the trial record.

*Garcia,* at *9.  The government did not do so, and did not in either trial.  While in the second trial the district court failed to go even as far to caution the jury as it had in the first trial, SA Dayton actually went yet further, describing even more information communicated to her by cooperators in this trial, but who did not testify.

 Of the three co-conspirators Agent Dayton specifically identified as contributing to her "understanding of the coded language used in this

28

case," though by her own admission there may have been more than three, only one testified at trial. We explained that in the face of such risks, "[t]he question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay." [*United States v.*] *Johnson,* 587 F.3d [625,] at 635 [4th Cir. 2009)].

*Garcia,* at *9.

> To its credit, the district court did recognize this problem.

> The Court:    But in part, in explaining the basis for her opinion, she has gone beyond saying cooperators generally. She is saying cooperators in this case essentially. ... But I think it is risky to be telling the jury that there are cooperators who can confirm this, unless they are going to be testifying.

JA 409-411. Unfortunately, this recognition by the district court did not give rise to any cautionary or limiting instruction, nor did it rein in government counsel to any degree, to which failure the court in turn failed to respond, leaving the obvious error unremediated.

> We find a second, equally fundamental flaw in the presentation of Agent Dayton's testimony in addition to the above infirmity: *the lack of foundations laid for each interpretation testified to*, so much so that we are compelled to conclude that the record fails to demonstrate the requisite reliability in Agent Dayton's execution of her claimed methodology.

*Garcia,* at *10 (emphasis supplied).

> While SA Dayton again agreed that the context of a call was important to an understanding of its meaning, JA 223-224, with which proposition the government agreed as it advanced this in support of SA Dayton's expertise, JA 262, SA Dayton

provided varying interpretations of the meaning of many terms without ever providing an explanation as to why the meaning had changed, and did so certainly without tying this variance to what must be described as an amorphously shifting and uncertain "methodology."

> The problem with this lack of foundation and reliably applied methodology becomes even more apparent when examining the instances when Agent Dayton's interpretations are inconsistent with each other. For example, she testified that the use of "2" by the conspirators means either $200, J.A. 600, or $2,000, J.A. 533. In fact, in the explanation for interpreting "2" to mean "$2,000," Agent Dayton testified that drug traffickers "drop zeros [sic] to make the numbers sound smaller." *Id.* This would be an explanation for both of these interpretations, and there is no indication in the record why Agent Dayton's expert methodology reasonably leads her to conclude that the same term means $200 in one instance, but $2,000 in another.

*Garcia,*\*10. This is unsurprising, since SA Dayton seldom if ever provided a basis for an interpretation tied to her methodology, even when a term had but a single decoded meaning, in her expert opinion.

> In another instance, Agent Dayton testified that, in her expert opinion, "590" was code for 590 grams of heroin. J.A. 774. She gave no explanation for the basis of this opinion, and importantly, her testimony that the number 590 actually meant 590 is inconsistent with the only methodology she offered for how she decoded the numbers heard in the calls: that the dealers spoke in code about numbers by dropping the zeroes.

*Garcia,* at *11. SA Dayton testified about this very number yet again in the second trial, and provided no greater illumination as to the source of this interpretation.

SA Dayton:  About halfway down Mr. Powell asks the question 590, and
then Mr. Garcia reinforces five nine zero.  That's a reference
to 590 grams of heroin.

JA 1174.  This was the sum of her testimony, and no more.  In light of the guilty verdict

for Garcia, it was entirely foreseeable that the government would rely again upon the

same testimony to achieve the same result.

Once again, SA Dayton's testimony left the jury bereft of any idea

whatsoever concerning the provenance of this interpretation.  Were this an isolated

instance, it might be arguably acceptable.  It was, however, not isolated, rather it was

the paradigm for SA Dayton's testimony, as the entirety of her testimony was riven

with these sorts of "interpretations," all of which were presented to the jury absent any

form of explanation or basis.  These included:

> "7" means 700, JA 320-321.

> "4" means 4,000, JA 445, 469-470.

> "6" means 6,000, JA 449-450, 480.

> "2" means 2,000, JA 551.

> "3" means 3,000, JA 551.

> "2" means 2,000, JA 642.

> "2" means 2,000, JA 663-664.

> "400" means 4,000, JA 908.

31

> "5" means 5,000, JA 1164.

> "$500" means 500g of heroin, JA 1170.

> "$800" means 800g of heroin, JA 1170.

> "$900" means 900g of heroin, JA 1170.

> "325" means 325 g of heroin JA, JA 1171.

> "$140" means 140 g of heroin, JA 1171.

> "500" means 500 g of heroin, JA 1171-1172.

> "4" means $4,000, JA 1216.

> "23 means 2,300, JA 1216.

> "22" means "2,200, JA 1216.

>  "2" means 2,000, JA 1217.

> "8" means 8,000 or $8,000, JA 1218.

>  "9" means 9,000 or $9,000, JA 1218.

> "42" means 4,200, JA 1220.

> "11" means $1,100, JA 1220.

> "23" means 2,300, JA 1220.

> "100" means 100g of heroin, JA 1222.

> "3" means 300 g of heroin, JA 1228.

> "4" means 400 grams, JA 1364.

> "500, 600 pesos" means 500-600 g of heroin, JA 1379.

> "number 3" means 300 grams, JA 1396.

> "number 4" means 400 grams, JA 1396.

These naked interpretations, with which her testimony in each trial was "replete," *Garcia*, at *11, were the culmination of SA Dayton's six days of testimony, with two dozen trips to the stand, and are perhaps the most troubling, for they make clear not only the entire lack of any boundary between her factual and expert testimony, but demonstrate the entire lack of any clarification to the jury that such a boundary even existed.

Even if each interpretation were correct, not a single one resulted from, let alone even required, the application of expertise to relate it to the jury. The provision of testimony *sans* expertise was SA Dayton's stock in trade, even where it was wholly unnecessary.

> In several instances, Agent Dayton "decoded" words and phrases that needed no expert translation at all since the meaning was either apparent on its face or apparent with contextual information that any fact witness could have provided. . . . This purported "decoding" of language that did not actually need decoding casts further doubt on whether Agent Dayton was reliably applying her methodology.

*Garcia,* at *11.

This again was an issue in the second trial, as SA Dayton sought to explain the contextually "apparent," *id.*, including:

33

> "number"  –  JA 450.

> "that thing,"  –  JA 475.

> "last one"  –  JA 543.

> "something"  –  JA 544.

> "it"  –  JA      JA 555.

> "something"  –  JA 567.

> "whatchacallem"  –  JA 635.

> "something"  –  JA 637.

> "something"  –  JA 643.

> "stuff"  –  JA 1168.

> "stuff"  –  JA 1395.

> "it"  –  JA 1396.

      In each trial,

[t]he record is replete with instances of Agent Dayton providing no explanation for her interpretation, other than a token reference to her expertise in the Government's framing of questions.

*Garcia,* at *11.

      In the second trial this "token reference" had continued in the form of the questions posed by government counsel, yet we still do not find any greater clarity in the content of the answers regarding the origin of ostensible "expertise" on the part of

SA Dayton.  Unsurprising this, for even a less-than careful examination makes amply clear that there is no origin – for there is no expertise.  Rather, during the second trial government counsel led SA Dayton to offer expert testimony, and SA Dayton, routinely and continually, then offered her "expertise" untethered to any basis beyond her supposition, and only occasionally based upon her having gained information through the investigation.

> Ms. Ducao:  In your expert opinion, is there coded language in this call or not?
>
> SA Dayton:  On the second page of this call there is. In the very first line that is Mr. Garcia's, where he uses the word car, that is actually code for heroin, and when he talks about the owner, that is the owner or the supplier of the heroin.
>
> Ms. Ducao:  And how did you determine that this was coded language?
>
> SA Dayton:  I believe as we listened to the calls, and then the follow-up surveillance, we determined that when, whether it be Mr. Garcia or Mr. Veras or someone else visited Mr. Powell to bring a car, they never had a car with them. So that was our first clue that they weren't bringing cars to Baltimore, and then in the overall context of the calls as they went on.

JA 298.

No expertise was deployed to arrive at these conclusions, in that they were based solely upon the investigation  – as law enforcement (the collective "we," a prominent feature of SA Dayton's testimony) undertook to "listen" and conduct "surveillance" and "determine" –  and no expertise was necessary to provide this *fact*

testimony. This is as demonstrative of the arc of SA Dayton's testimony as it is of the

failure of either government counsel or the district court to ameliorate this in the

second trial, in the very same way that they both failed to do so in the Garcia trial.

> While the district court was appropriately careful in its initial examination
> of Agent Dayton's qualifications to testify as an expert, it failed to
> maintain its "gatekeeper" role throughout that testimony, *Gen. Elec. Co.
> v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and
> the Government did little, if anything, to protect the generous ruling it had
> obtained from the district court from morphing into error.

*Garcia,* at *11. This is particularly obvious in the number of answers provided by SA

Dayton which explained her interpretation, her "decoding," based upon the course of

the investigation, as has been discussed, *supra.*

This extended further, for SA Dayton (not a Spanish speaker) did not

explain all of the calls; when it came to the calls solely in Spanish, she explained solely

the translations, without more. This presented the same problem in each trial.

> As Agent Dayton explained, the context of a conversation is an important
> factor when decoding suspected drug language. Although the jury heard
> English language transcripts of the actual call recordings read aloud,
> Agent Dayton provided no insight as to what steps, if any, she took to
> ensure that the context of the conversation was not lost or meaningfully
> altered in the process of translating the calls from Spanish to English.

*Garcia,* at *10. Once again, no additional effort was deemed necessary by SA Dayton

for the second trial than the inadequate presentation in the first. JA 273-281.

With error having been recognized by this Court as manifest, and having

36

done so on these identical facts, to rescue the result of the second trial from an

inexorable reversal along the same path as that described in *Garcia*

> the Government must demonstrate that the error did not have a 'substantial and injurious effect or influence in determining the jury's verdict.' " United *States v. Curbelo,* 343 F.3d 273, 278 (4th Cir.2003) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

*Garcia* at *11. This it simply cannot do.

> Here, in a trial spanning twelve days, Agent Dayton testified on six different days, recalled to the stand eighteen times. From the beginning of the trial to the end of the trial, the calls and the meaning of the words used in those calls were the centerpiece of the Government's case. There was little direct evidence connecting Garcia to three of the four actual possession charges, and law enforcement never observed Garcia actually exchanging drugs or money with any coconspirators. We cannot find Agent Dayton's testimony harmless under the circumstances.

*Garcia* at *12. The second trial lasted a similar time (fourteen days), with the last two

of these again involving only jury deliberation and questions. JA 16-17. SA Dayton's

testimony again extended across on "six different days," but was to incorporate no

fewer than 23 separate trips to the stand, and again was "the centerpiece of the

Government's case." *Id.* JA i-viii (JA Table of Contents, setting forth the witnesses

serially on each day of trial).

Those circumstances requiring reversal in *Garcia* necessarily must be

understood to extend to the second trial no less than this Court determined them to

encompass the first. Summary reversal is mandated.

37

## II.    THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTION OF EACH APPELLANT ON CONSPIRACY TO DISTRIBUTE MORE THAN 1 KG OF HEROIN.

**Standard of Review**

All Appellants join this issue.

This Court reviews a district court's ruling on a motion for judgment of acquittal *de novo. United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998). The Court must determine whether a rational jury could have found the essential elements of the crime beyond a reasonable doubt, and in this determination considers the evidence in the light most favorable to the government. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982); *United States v. Bynum*, 604 F.3d 161 (4th Cir. 2010). A jury verdict will be upheld if there is "substantial evidence" to support it, *Glasser v. United States*, 315 U.S. 60, 80 (1942), and this is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010). In determining whether there is substantial evidence, the court should allow the government "all reasonable inferences that could be drawn in its favor." *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008).

**Argument** – *all Appellants*

The verdict of a trial jury will be upheld if there is substantial evidence to

support it. *Burks v. United States,* 437 U.S. 1, 17 (1978). In undertaking this review, the appellate court will accord the Government all reasonable inferences from the facts and evidence properly adduced to those propositions which the Government seeks to establish, *United States v. Tresvant,* 677 F.2d at 1021, viewing the evidence in the light most favorable to the Government, *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). The standard is the familiar one, whether "any rational trier of fact" could have found the elements of the offense to exist to the reasonable doubt standard. *Id.*

Where, however, the record shows a lack of evidence from which a jury could find guilt beyond a reasonable doubt, the conviction should be reversed and the matter remanded for the entry of a judgment of acquittal. *See United States v. Lowe*, 65 F.3d 1137, 1142 (4th Cir. 1995); *Jackson v. Virginia*, 443 U.S. at 317 ("[A] properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt . . . . In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction."); *Ortega- Rodriguez v. United States*, 507 U.S. 234, 249 (1993) ("In the class of appeals premised on insufficiency of the evidence, . . . retrial is not permitted in the event of reversal.").

**Argument - *Appellant Veras-Rosario***

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed

39

for the offense, the commission of which was the object of the attempt or conspiracy.

21 USC § 846.  Appellants were convicted of conspiring to distribute and possessing with the intent to distribute one kilogram or more of heroin in violation of this section.

There were over 20,000 calls, 1,928 of which were deemed pertinent in this case, and over 200 of which were played for the jury.  *See Garcia,* at *4 (giving numbers for the first trial).  Appellant Veras-Rosario took part in ten (10) telephone conversations.  The majority of these calls were directed at her husband and co-defendant, Jan Carlos Veras-Rosario.  No heroin or proceeds of crime were ever recovered from Appellant Veras-Rosario.  The government's evidence showed that she visited Baltimore once with her husband.  They were never stopped, nor was there any physical evidence ever presented that a distribution of heroin had taken place.

The government's evidence showed only that  Appellant Veras-Rosario was present with her husband on certain occasions and that he, not she, *might* have been involved with a drug transaction.  There is no evidence that  Appellant Veras-Rosario had knowledge of her husband's activities.  Indeed, the evidence showed that she believed that the money taken from her husband by the Baltimore City Police Department was from his tax return refund.  There was no evidence that  Appellant Veras-Rosario ever knew of her co-defendant,  Appellant Clay, or ever had any interaction with him.  Hence the government has not met the burden of proving beyond

40

a reasonable doubt that Appellant Veras-Rosario was part of this conspiracy.

Any person who attempts or conspires to commit any defense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the conspiracy.

21 USC § 846.

....., it shall be unlawful for any person knowingly or intentionally ----
(1) To manufacture, distribute, or dispense, or possess with intent to distribute or dispense, a controlled substance

21 USC § 841(a)(1). Hence it is apparent that Appellant Veras-Rosario only can be convicted if she willingly and knowingly became involved in this conspiracy to distribute heroin. Certainly, the circumstantial evidence that surrounded this case lends itself to an inference that her husband had lied to her as to his involvement with this conspiracy.

The Supreme Court in *Jackson v. Virginia*, 443 U.S. at 318-319, stated that a reviewing court must determine whether the evidence in the record can support a finding of guilt beyond a reasonable doubt in a light most favorable to the plaintiff. *Id.* In the instant case the government has failed to prove that Appellant Veras-Rosario knowingly or intentionally was part of this conspiracy, and cannot point to any evidence, circumstantial or otherwise, to support the verdict.

**Argument - *Appellant Garo-Zalazar***

Count 1 of the Superseding Indictment charged that from April, 2009

41

through November, 2011 Appellant Garo-Zalazar conspired with 14 named persons and other unnamed persons to possess with the intent to distribute 1 kilogram or more of heroin.  JA 79.  To prove a conspiracy to possess heroin with intent to distribute, the Government needed to establish: (1) an agreement to possess heroin with the intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996).

> The requisite agreement to act in concert need not result in any such formal structure, indeed frequently, in contemporary drug conspiracies, contemplates and results in only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market.

*United States v. Banks*, 10 F.3d 1044,1054 (4th Cir. 1993)(emphasis added).

Appellant Garo-Zalazar contends that the application of the foregoing conspiracy principles have no application when considering the facts in this case. This is true simply because no acts or statements of either Appellant Garo-Zalazar, Jan Carlos Veras-Rosario, or Walter Lee Powell were offered as evidence that Appellant Garo-Zalazar was a member of any conspiracy. What was involved in this case, insofar as the evidence showed, was that:

(1) Jan CarlosVeras-Rosario, Garcia, and Powell, and others agreed to possess and transport heroin from New York City - Maryland;

42

(2) Jan Carlos Veras-Rosario traveled often by bus from New York City to Baltimore, Maryland to deliver packages which contained heroin to Walter Lee Powell, who, in turn, gave currency to Veras-Rosario as payment;

(3) that on a limited number of trips, Jan Carlos Veras-Rosario was accompanied by Appellant Garo-Zalazar during these trips;

(4) that in preparation for the trips, Appellant Garo-Zalazar occasionally acted as an interpreter on telephone calls between Jan Carlos Veras-Rosario and Powell;

(5) That during some fo the recorded calls, Appellant Garo-Zalazar is heard using what the government alleged to have been, coded language and that in his post-arrest statement, Appellant Garo-Zalazar allegedly acknowledged that he knew the meaning of certain coded language used by others n the conspiracy; and

(6) Appellant Garo-Zalazar's involvement was limited to the time between February and June, 2011.

At no time during the government's investigation was Appellant Garo-Zalazar found to be in possession of either controlled substances or currency. On one occasion, February 27, 2011, law enforcement approached and searched Jan Carlos Veras-Rosario and Appellant Garo-Zalazar at the Baltimore Travel Plaza as they waiting to board a bus to return to New York City. As a result of the search of Jan Carlos Veras-Rosario, approximately $7,000 in U.S. currency was found in his pocket,

the inference being that the $7,000 represent payment for a package of heroin previously delivered to Powell. There was no observation of such a transaction, and it remains in the realm of pure speculation

      This Court has made clear that facts such as those present herein are insufficient to carry the conspiracy charge to the jury.

> [C]ircumstantial evidence that proves nothing more than association between two persons, even if one has a fixed intent known to the other to commit an unlawful act, is not sufficient to permit the inference of the requisite agreement between the two to act in concert to commit the act. Because conspiracy requires agreement between at least two persons to take a concerted action, if the purposes of the alleged coconspirators are different, ... there is no conspiracy.

*United States v. Giunta*, 925 F.2d 758, 764 (4th Cir. 1991).

      In other words, the mere fact that two persons associate with one another, and one of them is intent upon distributing illegal drugs and the other one is knowledgeable of this intent, such facts do not a conspiracy make. In the case *sub judice*, and viewing the facts in a light most favorable to the government, Appellant Garo-Zalazar may have known of Jan Carlos Veras-Rosario's unlawful intentions. But, because, the limited telephone call evidence cannot carry the day, as shown above, any knowledge Appellant Garo-Zalazar may have possessed concerning Jan Carlos Veras-Rosario's illegal intentions is simply insufficient to permit the inference of the requisite agreement between the two to establish a conspiracy. Casual transactions between persons who may be involved in a conspiracy are insufficient to prove the critical

connection. *United States v. Powell*, 982 F.2d 1422, 1429 (10th Cir. 1992).

In order to find a person guilty of conspiracy, it is necessary to show that the individual knowingly participated in the conspiracy while showing "some element of cooperation beyond mere knowledge of the existence of the conspiracy." *Id*. Here, the evidence clearly showed that Powell, Garcia, and Jan Carlos Veras-Rosario and others were active participants in a conspiracy to distribute heroin. The evidence, at best shows that Appellant Garo-Zalazar acted as a companion to accompany Jan Carlos Veras-Rosario in his travels between New York and Baltimore. It also shows that Appellant Garo-Zalazar on occasion acted as a translator/interpreter for Jan Carlos Veras-Rosario. Indeed, on most of the intercepted calls, Jan Carlos Veras-Rosario can be heard in the background, telling Appellant Garo-Zalazar exactly what to say. JA 610, 616, 793, 1176, 1178, 1179, 1290-1291. There are no intercepted calls wherein Appellant Garo-Zalazar was initiating and/or negotiating transactions independent of Jan Carlos Veras-Rosario. Also, at one point, after law enforcement approached and seized approximately $7,000 from Jan Carlos Veras-Rosario's coat pocket at the Baltimore Travel Plaza, Appellant Garo-Zalazar walked over to Det. Petocchelli, the seizing agent and acted as a translator for Jan Carlos Veras-Rosario in his conversations with law enforcement. JA 520.

As described, *supra,* the government's trial evidence consisted primarily

45

Title III electronically intercepted telephone communications between Powell, Danilo Garcia and others. In all, the Government offered in excess of 260 telephone calls. Of those, FBI SA Dayton, in her expert opinion, identified Appellant Garo-Zalazar through voice recognition as being a participant on only eleven (11) of these calls. There was no testimony presented through cooperating witnesses and/or law enforcement surveillance, wherein Appellant Garo-Zalazar was identified as being a participant and/or actually observed to be talking on a telephone at the time of one of the recorded calls. Furthermore, aside from SA Dayton, the government presented no other evidence which identified Appellant Garo-Zalazar voice on any of the calls.

Throughout her lengthy testimony during the government's case-in-chief, SA Dayton unequivocally insisted that her identification of the participants on the calls was accurate. The government's evidence also included two calls on June 21, 2011, call numbers 4517 and 4518, respectively, JA 2278-2286, wherein SA Dayton testified on direct examination by government counsel that she specifically identified Appellant Garo-Zalazar as a participant on the calls. She based this conclusion on her expert opinion, her voice recognition of Appellant Garo-Zalazar, and content of the calls. JA 1219-1221. She unequivocally opined that the calls were not three-way calls, meaning that Appellant Garo-Zalazar was at the same location as Jan Carlos Veras-Rosario, the other participant in the calls, and who was in New York City at the time of the calls.

46

Only later, when confronted by evidence presented by the defense establishing beyond

question that Appellant Garo-Zalazar was in the Dominican Republic at the time of the

two referenced calls and could not have been participating in them, did SA Dayton

retract her testimony and admit that she was mistaken. JA 1297-1298.

**III. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL AT THE CLOSE OF THE EVIDENCE, ON THE GROUNDS THAT THE EVIDENCE ADDUCED WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT EACH APPELLANT OF PARTICIPATION IN THE CONSPIRACY TO DISTRIBUTE OR POSSESS WITH THE INTENT TO DISTRIBUTE 1 KG OF HEROIN, GIVEN THE FACTS THAT EACH APPELLANT WAS NOT PART OF THE CONSPIRACY, DID NOT COMMIT ANY OVERT ACTS, AND WAS NEVER FOUND TO POSSESS ANY HEROIN OR MONEY OR OTHER INDICIA OF NARCOTICS TRAFFICKING.**

**Incorporation of Standard of Review and Argument**

Appellants hereby incorporate the entirety of the standard of review and

argument set forth in Issue II, *supra,* as if fully set forth in this portion of the

Argument.

**IV.   THE DISTRICT COURT ERRED WHEN IT ALLOWED THE GOVERNMENT TO MAKE IMPROPER CLOSING AND REBUTTAL ARGUMENTS, WHICH SHIFTED THE BURDEN OF PROOF AND HIGHLIGHTED THE FAILURE OF APPELLANT VERAS-ROSARIO TO TESTIFY.**

**Standard of Review**

Appellant Veras-Rosario advances this issue.

If a trial court abuses its discretion in addressing an objection to closing

47

argument, such an abuse will justify reversal of a conviction only if it constitutes prejudicial error. *United States v. Ollivierre*, 378 F.3d 412,417 (4th Cir. 2004). *United States v. Grabiec,* 563 F.2d 313, 319 (7th Cir.1977); *United States v. Davis,* 557 F.2d 1239, 1244-45 (8th Cir.1977).

**Argument**

Prior to closing argument, the Court gave its jury instructions. The Court gave Modern Federal Jury Instruction 7.4, from *Sand, et al.,* over Appellant's objection.[6]

> In a criminal case, a defendant is never required to testify, but if he chooses to testify, he is of course permitted to take the witness stand on his own behalf. In this case, Mr. Roy Clay decided to testify. You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of the case. You should not disregard or disbelieve his testimony simply because he is charged as a defendant in this case.  Now, the defendants Jasmine Veras-Rosario and Victor Garo-Zalazar did not testify in this case. As I told you, under our constitution, a defendant has no obligation to testify or to present any other evidence, because it's the government's burden to prove a defendant guilty beyond a reasonable doubt.

JA 2074-2075.

This instruction did nothing but highlight the fact that Appellant Veras-Rosario had not testified.

The prosecutor, AUSA Christopher Romano, then made the improper

---

[6]  This objection is not in the record as jury instructions were discussed by the parties in chambers, and this was not on the record.

comment in his closing argument that had the effect of burden shifting to the Appellant

Veras-Rosario:

> MR. ROMANO:    Now, part of their argument I submit to you will be my clients can't possibly be guilty because the government didn't show any of this heroin, any of this heroin was seized from Mr. Clay, from Mr. Garo-Zalazar, or from Jasmine Veras-Rosario, and therefore they can't be guilty. Well, folks, that argument is wrong, and it's wrong for the simple reason that what the crime is, is what Judge Blake just told you is conspiracy.

> MR. CARROLL:    Your Honor, I object. Can we approach?

(At the bench)

> MR. CARROLL:    Your Honor, Mr. Romano is burden-shifting saying by we're going to say this in this our argument. We don't even have to put up an argument. I'd object to that strenuously. He's burden-shifting, Your Honor.

> THE COURT:    He's not burden-shifting. It's extremely reasonable for him to anticipate that you are going to stand up and make some arguments.

> MR. CARROLL:    He just said because he named us individually, because named the defendants individually because they would never personally possess the heroin that they can't be found guilty. If that's not burden-shifting, what is, Your Honor? He's saying what he expects us to get up and argue. We don't have to get up and argue.

> THE COURT:    Overruled.

JA 2094-2095.

AUSA Ayn Ducao, Romano's co-counsel, having witnessed this

interchange, inexplicably in her rebuttal argument again impermissibly commented on

49

Appellant Veras-Rosario's failure to testify:

MS. DUCAO:     Now, Mr. Clay's testimony, now you can't hold it against Mr. Garo-Zalazar and Miss Veras-Rosario that they didn't testify. They have the presumption of innocence. They don't have to testify. You can't hold it against them. Mr. Clay did choose to testify, and because he did, you have to evaluate his testimony in the same way you would evaluate any other witness's testimony.

JA 2210-2211.

THE COURT:     Okay. Anything else?

MR. CARROLL:     Your Honor, I notice the Court's displeasure when I interrupted Mr. Romano. I thought it was extremely improper when [s]he commented on the defendant [not]taking the stand. I think that it was highly improper.

THE COURT:     Were you in the courtroom, Mr. Carroll? She specifically said they could not hold it against them.

MR. CARROLL:     She shouldn't be doing that, for the appellate record.

THE COURT:     I think there's nothing improper what she did. In fact, it was a good idea to remind people as to the defendants that did not testify you can't hold it against them. I don't see anything wrong. But you have your exception, if necessary, for the appellate review.

JA 2219-2220.

Had Appellant Veras-Rosario objected at the time of the prosecutor's rebuttal comments, this would have highlighted the fact that she did not take the stand. If she had asked for a curative instruction, this too would have emphasized her failure

to testify – and thereby accentuated the very basis for her objection. A prosecutor who wishes to argue in summation that the government's evidence has been largely uncontradicted must walk a fine line. … " *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.), *cert. denied,* 434 U.S. 872 (1977). On the other hand, the prosecutor also must avoid commenting in a way that impinges on the defendant's constitutional rights and privileges. For example, she may not permissibly comment on the failure of the defendant to testify, *see Bubar, id.; United States v. Gotchis*, 803 F.2d 74, 81 (2d Cir.1986), or invite the jury to "presume" in the absence of countervailing evidence that the government's view of the case is correct, *see id.* at 80-81, or suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatever, *see, e.g., United States v. Walker*, 835 F.2d 983, 988-89 (2d Cir.1987); *United States v. Cruz*, 797 F.2d 90, 93 n.1 (2d Cir.1986).

The prosecutor's comments in closing had the effect of shifting the burden of proof onto Appellant Veras-Rosario. The prosecutor's comment in the rebuttal argument compounded and reinforced this impermissible argument, in that they highlighted the fact that Appellant Veras-Rosario had not testified. In order to obtain reversal of a conviction on the ground that the prosecutor has crossed the boundary between permissible and impermissible argument, a defendant must show that the improper argument caused him substantial prejudice. *See, e.g., United States v.*

*Walker*, 835 F.2d at 988; *United States v. Nersesian*, 824 F.2d 1294, 1327 (2d Cir.), *cert. denied,* 484 U.S. 958 (1987); *United States v. Cruz*, 797 F.2d at 93 n.1. In determining whether the defendant has suffered such prejudice, we consider the seriousness of the misconduct, the measures adopted by the trial court to cure the misconduct, and the certainty of conviction absent the improper statements. See, e.g., *United States v. Walker*, 835 F.2d at 988; *United States v. Nersesian*, 824 F.2d at 1329; *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam), *cert. denied,* 456 U.S. 989 (1982).

The prejudicial effect of the prosecutors' improper arguments was compounded by the timing of the comments. If defense counsel had stood up and objected during the government's rebuttal argument, or asked for a curative instruction, this would have re-emphasized the burden shifting in the government's closing argument and that his client, Appellant Veras-Rosario, had failed to testify. Curative judicial instructions, however, do not always eradicate the harm that has been inflicted. In effect, defense counsel was denied thereby the opportunity to contest or explain the statements in summation before the jury. Between the dearth of evidence, and the combined effect of the government's closing and rebuttal argument, the Appellant Veras-Rosario was denied a fair trial.

## V.  THE DISTRICT COURT ERRED IN DENYING APPELLANT VERAS-ROSARIO'S REQUEST AT SENTENCING FOR THE SAFETY VALVE EXCEPTION PURSUANT TO 18 USC §§ 3553(A) &(F) AND USSG § 5C1.2, FOR WHICH SHE QUALIFIED.

**Standard of Review**

Appellant Veras-Rosario advances this issue.

An appellate court reviews a sentencing court's factual findings for clear error, but review the court's interpretation of the safety valve provisions de novo. *United States v. Ramirez,* 94 F.3d 1095, 1099 (7th Cir.1996); *United States v. Flanagan*, 80 F.3d 143, 145 (5th Cir.1996).

**<u>Argument</u>**

Acting to prevent the mandatory minimum sentences for certain drug trafficking offenses from causing the "least culpable offenders [to] receive the same sentences as their relatively more culpable counterparts," H.R.REP. NO.103-460, at 4 (1994), Congress added the so-called "safety valve" provision to the Sentencing Guidelines in 1994, Mandatory Minimum Sentencing Reform Act of 1994, Pub.L. No.103-322, tit. VIII, 108 Stat. 1796, 1895-96 (codified at 18 U.S.C. § 3553(f)); USSG § 5C1.2.  The safety valve requires district courts to disregard these statutory minimum sentences and instead to sentence pursuant to the Guidelines when a defendant satisfies five indicators of reduced culpability:

(1)   the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines before application of subsection (b) of §4A1.3 (Departures Based on Inadequacy of Criminal History Category);

(2)   the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3)   the offense did not result in death or serious bodily injury to any person;

(4)   the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

(5)   *not later than the time of the sentencing hearing*, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

There is no question that Appellant Veras-Rosario qualifies under all of the separate requirements of the guideline: [s]he has no criminal history points, was not a manager, etc., engaged in no violence or firearms usage, and "not later than the time of the sentencing hearing," 18 USC § 3553(f)(5), has told the government all that [s]he knows about this matter. *United States v. Schreiber*, 191 F.3d 103 (2nd Cir. 1999) (deadline for complying is sentencing hearing).

In *United States v. Espinosa*, 172 F.3d 795 (11th Cir. 1999), the defendant was convicted by a jury of four drug offenses. Prior to sentencing, Espinosa gave the government a statement concerning the cocaine trafficking that led to his and his

54

confederates' indictment. Then, at the sentencing hearing, he asked the district court to determine the truthfulness of the information he had provided, and to give him the benefit of the safety-valve provision. The government objected, contending that Espinosa had not told the truth regarding the quantity of cocaine involved in the trafficking scheme. According to Espinosa, 30 kilograms were involved; according to the government, it was 300 kilograms. The court's response to this dispute was to say that because Espinosa had not testified at trial, it had no way of knowing whether he was telling the truth. The court therefore accepted the government's position and denied Espinosa's request for an offense-level reduction.

The district court erred in deferring to the government; the responsibility for determining the truthfulness of the information the defendant provided to the government was the court's. See *United States v. White*, 119 F.3d 70, 73 (1st Cir.1997); *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir.1997); *United States v. Maduka*, 104 F.3d 891, 895 (6th Cir.1997); *United States v. Thompson*, 81 F.3d 877, 880 (9th Cir.1996). The burden of proof on the truthfulness issue lies, of course, with the defendant.

In *United States v. Marones*, 181 F.3d 888,892 (8th Cir. 1999), the Court stated that a defendant who initially lies, but then tells all he knows before sentencing can receive safety valve credit. The Court also ruled the defendant has the burden of

proof in safety valve cases, and must take affirmative steps to provide information; however, once he has made a showing by a preponderance of the evidence that he is eligible for safety valve, it falls to the Government to show that the information is untrue or incomplete. *United States v. Shrestha*, 86 F.3d 935 (9th Cir. 1996**).** Past lies and omissions do not disqualify a defendant who ultimately tells the truth before sentencing. *United States v. Aidoo*, 670 F.3d 600, 610 (4th Cir. 2012); *United States v. Schreiber*, 191 F.2d 103 (2nd Cir. 1999).  (The statute provides no basis for distinguishing between defendants who provide only truthful information and those who provide information before finally telling the truth). *United States v. Brownlee*, 204 F. 3d 1302 (11th Cir. 2000) Similarly. a defendant's tardiness in providing full information will not disqualify him from safety valve relief. Although the defendant in this type of case may have told the government inconsistent stories, it serves the purposes of the safety valve to grant relief if the sentencing court is persuaded that the last story is complete and truthful.  *See United States* v. *Tournier*, 171 F.3d  645, 647-48 (8th Cir. 1999).

One court has indicated that a defendant's attempt to furnish information to the government  in the judge's chambers before the sentencing hearing was not "too late". *United States v. Gama-Basitida*, 142 F.3d 1233 (10th Cir. 1998). A defendant is eligible for the safety valve if she is forthright to the extent of her abilities. *United*

*States v. Thompson*, 76 F.3d 166 (7th Cir. 1996). *United States v. Brack*, 188 F.3d 748, 762-763 (7th Cir. 1999) (defendant's written statement, if truthful, combined with his offer to meet with the government satisfied the safety valve disclosure requirement); *United States* v. Ivester, 75 F.3d 182, 184-185 (4th Cir. 1996) (requirement of affirmative act truthfully disclosing all evidence he has). The government cannot preclude the application of the safety valve by failing to make itself available for such a proffer, once the offer is made by the defense. *Brack*, 188 F.3d at 763 (government rebuffed defendant's offer to meet).

Simply put, if a defendant qualifies for the safety valve, it is incumbent upon the sentencing court to apply it, which thereby removes the application of the statutory mandatory minimum at sentencing. *United States v. Beltran-Ortiz*, 91 F.3d 665 (4th Cir. 1996). The defendant qualifies for the safety valve, under the plain language of the pertinent USC and USSG provisions, as applied to the clear record in this matter. The grant of this relief by the trial court is mandatory when a defendant qualifies. *United States v. Ortiz-Santiago*, 211 F.3d 146, 150-153 (1st Cir. 2000), *United States v. Leonard*, 157 F.3d 343 (5th Cir. 1998). The appellant should not have to suffer because the government prosecutors were not willing to meet with her after the trial.

57

## VI.  THE DISTRICT COURT ERRED IN DENYING APPELLANT VERAS-ROSARIO'S REQUEST AT SENTENCING FOR A DOWNWARD DEPARTURE FOR ACCEPTANCE OF RESPONSIBILITY PURSUANT TO USSG § 3E1.1(A).

**Standard of Review**

Appellant Veras-Rosario advances this issue.

An appellate court reviews the denial of a motion for a two level downward departure for acceptance of responsibility de novo. *United States v. Booker,* 543 U.S. 220, 224 (2005).

**Argument**

In *United States  v. McKinney* , 15 F.3d 849, ( 9th Cir. 1994), the court stated:

> The 1991 version of the Sentencing Guidelines provides for a two-level reduction "if the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." U.S.S.G. Sec. 3E1.1(a) (1991).
>
> A defendant is not required to plead guilty to receive the acceptance of responsibility reduction. See U.S.S.G. Sec. 3E1.1(b) (1991) ("A defendant may be given consideration under this section without regard to whether his conviction is based on a guilty plea or a finding of guilt by the court or a jury...."). Although the commentary to Section 3E1.1 states that "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthful admission of involvement in the offense and

related conduct will constitute significant evidence of acceptance of responsibility for the purposes of this section," U.S.S.G. Sec. 3E1.1 cmt. 3 (1991), nothing in the guidelines requires a defendant to plead guilty in order to receive the reduction. *See United States v. Gonzalez*, 897 F.2d 1018, 1020 (9th Cir.1990). Indeed, were a defendant required to plead guilty to be entitled to the reduction, the sentencing guidelines would penalize the exercise of the constitutional right to go to trial. *See United States v. Johnson*, 956 F.2d 894, 904 (9th Cir.1992). Where a defendant manifests a genuine acceptance of responsibility for his actions, he is entitled to the reduction even if he does not plead guilty. See U.S.S.G. Sec. 3E1.1 cmt. 2 ("Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.").

Although the application note to USSG § 3E1.1 cmt. 2 lists only a single example of a case where a defendant can receive the reduction despite going to trial, the quoted passage itself makes clear that the example was not intended to be exhaustive. In appropriate circumstances the reduction is also available in cases in which the defendant manifests genuine contrition for their  acts but nonetheless contests their factual guilt at trial.

A focus on the defendant's personal contrition, rather than on her exercise of her constitutional rights, best serves the purposes of the acceptance of responsibility reduction. The primary goal of the reduction is to reward defendants who are genuinely contrite. See U.S.S.G. Sec. 3E1.1 commentary and background; *United States v. Wivell*,

893 F.2d 156, 158 (8th Cir.1990). In the ordinary case, a defendant who pleads not guilty and is convicted will have a difficult time convincing the court that their subsequent acceptance of responsibility for her actions is anything but a self-serving and insincere expression. Where the defendant's statements and conduct make it clear that her contrition is sincere, however, she is entitled to the reduction even if she is convicted after a trial. The defendant's admissions and attempts to plead guilty demonstrate her attempts at contrition.

The Court has   found the acceptance of responsibility reduction appropriate in cases where the defendants' contrition seemed far less genuine than that in *McKinney , id.*  For example, in *United States v. Johnson*, 956 F.2d 894, 904 (9th Cir.1992), the Court vacated a sentence and instructed the district court to consider whether a defendant was entitled to the reduction where she pled not guilty only because she could not obtain a favorable plea bargain. Unlike *McKinney*, the defendant in *Johnson* could have entered a plea of guilty any time she wanted to; she only chose not to because she could not strike a deal on favorable terms. *See also United States v. Rodriguez*, 975 F.2d 999, 1008 (3rd Cir.1992) (vacating sentence for consideration of acceptance of responsibility reduction where defendants had gone to trial after the government  revoked its plea bargain agreement). In *United States  v. Hill,* 953 F.2d 452, 461 (9th Cir.1991), the court upheld a grant of the reduction because the district

60

court found that the defendant was sincerely contrite despite the fact that his expression of remorse came at the "eleventh hour" – his sentencing hearing. *McKinney*, by contrast, expressed remorse for his conduct soon after his arrest, in his confession statement, in open court at trial, and at his sentencing hearing.

In *United States v. Thompson*, 76 F.3d 166 (7th Cir. 1996), the Court granted a two level downward departure after the defendant took her case to trial. The government argued against this stating that it was required to assume the burden of trial because of Thompson's denial of legal guilt. The court relied on expert testimony that demonstrated that Thompson had a low level of cognitive functioning combined with an elevated need for approval from others, and has a limited ability to question and analyze her surrounding circumstances.

This is one of the unusual and limited number of cases in which a defendant is entitled to an acceptance of responsibility reduction despite having pleaded not guilty and having been convicted at trial. The appellant debriefed twice with the government and admitted to her role in the offense. JA 2291-2294. The government disputed her version of events.

## VII.  THE DISTRICT COURT ERRED IN DENYING APPELLANT VERAS-ROSARIO'S REQUEST AT SENTENCING FOR A DOWNWARD DEPARTURE FOR HER MINOR ROLE, PURSUANT TO USSG § 3B1.2(B).

### Standard of Review

Appellant Veras-Rosario advances this issue.

An appellate court reviews the denial of a motion for a two level downward departure for a mitigating or minor role de novo. *United States v. Pratt*, 239 F.3d at 640,646 (4th Cir. 2001).

### Procedural Background

In *United States v. Powell*, 680 F.3d 350 (4th Cir. 2012), the Court stated, Section 3B1.2 of the Sentencing Guidelines provides for various reductions to a defendant's offense level if the defendant "play[ed] a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2 & cmt. n.3(A). The defendant bears "the burden of proving, by a preponderance of the evidence, [680 F.3d 359] that he is entitled to a mitigating role adjustment in sentencing." *United States v. Pratt*, 239 F.3d 640, 645 (4th Cir.2001).

Pursuant to the U.S.S.G. 3B1.2, a mitigating role is:

### §3B1.2.    Mitigating Role

Based on the defendant's role in the offense, decrease the offense level as follows:

62

(a)    If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

(b)    If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

In  the instant case, this conspiracy as found by the jury involved the distribution of between one and three kilograms of heroin. The government recorded over 20,000 telephone calls. The government provided the defense with a three ring binder containing more than 500 pages of pertinent calls. Of the hundreds of calls played during the trial, only ten involved Jasmine Veras-Rosario. Of all the drugs involved in this case, only approximately an ounce can be attributed to Jasmine Veras-Rosario.  She is pictured in one series of photographs on April 3, 2011, walking into Walter Powell's house. She was never found with any drugs or any money attributed to drugs. She was married to a major participant in the conspiracy.  There simply was no basis not to reduce her USSG range based upon this evidence.

## **REQUEST FOR ORAL ARGUMENT**

The Appellants request oral argument, as they believe that it will assist the decisional process by assisting this Court in paralleling the facts below with those found to be dispositive by this Court in its reported decision in *Garcia, id.*

## <u>CONCLUSION</u>

For the foregoing  reasons, Appellants Clay, Veras-Rosario and Garo-Zalazar respectfully request this Court to reverse the judgments of the United States District Court for the District of Maryland as to each of them, and to remand their respective causes with an order for new trials on the merits, and to tax the costs of these proceedings to Appellee.

Alternatively, Appellant Veras-Rosario requests that her case be remanded for resentencing and that she be afforded a two level downward departure pursuant to the safety valve exception, a two level downward departure for acceptance of responsibility, and a two level downward departure for a having a minor role in the offense.

July 8, 2014                              Respectfully submitted,

                        _____/s/_____
                        MICHAEL D. MONTEMARANO
                        Michael D. Montemarano, P.A.
                        10630 Little Patuxent Parkway
                        Suite 146
                        Columbia, MD 2144
                        (410) 992-0067 /fax 992-6915
                        montemarano67@gmail.com
                        Counsel for Appellant Clay/CJA Counsel
                              Lead Appellate Counsel


                        _____/s/_____
                        MARK J. CARROLL
                        9520 Reach Road
                        Potomac, MD 20853
                        (301) 762-6453 /fax 762-6454
                        markjcarroll@hotmail.com
                        Counsel for Appellant Veras-Rosario
                              /CJA Counsel


                        _____/s/_____
                        ALAN R.L. BUSSARD
                        101 East Chesapeake Avenue
                        Suite 200
                        Towson, MD 21286
                        (410) 821-1155/ fax 307-1010
                        Alan.bussard@bussardlaw.com


                        Counsel for Appellant Garo Zalazar
                              /CJA Counsel

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,

Typeface Requirements and Type Style Requirements

1. This brief complies with the Type-volume limitation of Fed. R. App. 32(a)(7)(B) because:

    The word count of this brief is <u>14,391 words</u>.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using

<u>WordPerfect, Times New Roman, 14 point</u>.

July 8, 2014                     <u>/s/                          </u>

                                 MICHAEL D. MONTEMARANO

## CERTIFICATE OF SERVICE

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this 8th day of July, 2014, filed the required copies of the foregoing Consolidated Brief of Appellants and copies of the Joint Appendix in the Office of the Clerk of the Court via hand delivery and electronically, and have served the brief and appendix electronically through CM/ECF, to Ayn Ducao, Esq., Assistant United States Attorney, 36 South Charles Street, Suite 400, Baltimore, MD, Counsel for Appellee.

_____/s/_____

MICHAEL D. MONTEMARANO